NUMBER 13-06-487-CV



COURT OF APPEALS
 


THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


PNM INC, D/B/A STAR TRAC #1,

CORPUS CHRISTI, TEXAS, LICENSE

NO. BQ546829, Appellant,


v.


TEXAS ALCOHOLIC BEVERAGE

COMMISSION, ET AL., Appellees.

 


On appeal from the 117th District Court 


of Nueces County, Texas.

 

 

MEMORANDUM OPINION



Before Justices Yañez, Rodriguez, and Garza


Memorandum Opinion by Justice Garza
 

 Appellant, PNM, Inc. d/b/a Star Trac #1 (PNM), appeals from the trial court's
affirmation of the order of appellees, Texas Alcoholic Beverage Commission (TABC),
cancelling PNM's "Wine and Beer Retailer's Off-Premise Permit" (permit number BQ-546829). (1) By two issues on appeal, PNM claims that the administrative law judge's
findings of fact and conclusions of law are not supported by substantial evidence. We
affirm. 

I. Factual and Procedural Background (2)

 The permit at issue was originally issued to Star Tex Oil and Gas Inc. (Star Tex) in
1997. Feroz Al Momin and Piarali Jalbhai Prasla were the original incorporators of Star
Tex. The 2002 Texas Franchise Tax report shows Prasla as the vice president and
secretary of Star Tex. 

 In October 2003, upon selling the Star Tex corporate entity, Momin and Prasla filed
a supplemental change of corporation application requesting to have the Star Tex alcoholic
beverage permit changed over to PNM, Inc. (3) This change of corporation led TABC Agent
Brian Tullis to conduct an investigation of Momin and Prasla. The supplemental
application indicated that Momin was 51 percent owner and Prasla was 49 percent owner
of PNM. The application was signed by Prasla. Momin was listed as the president and
Prasla as the vice president and secretary on the original change of corporation
application. Sometime later, Momin submitted a new change of corporation application for
PNM, showing him as the sole officer and owner of 51 percent of PNM and showing Prasla
only as a shareholder. In February 2004, with Momin listed as the president, PNM issued
510 shares to Momin and 490 shares to Prasla. TABC renewed the permit on January 14,
2005.

 Through his investigation, Tullis discovered that Prasla is unauthorized to work in
the United States. On April 30, 2004, Tullis issued an administrative notice charging PNM
with employing a person without work authorization. Tullis entered the store and spoke to
Stephanie Bernal, a store employee. Bernal indicated to Tullis that Prasla was her
supervisor and that he hired her. She noted that Prasla was listed as the emergency
contact for the store and that she believed he was the owner. On June 4, 2004, PNM
agreed to pay a fine in lieu of a 15-day suspension of the permit. 

 Tullis continued to investigate PNM. On June 30, 2005, Tullis asked PNM to
provide corporate records, including minutes, stock certificates, bank signature cards,
income tax records for 2003 and 2004, and the last four months of financial records. PNM
complied. The stock certificates identified Momin as 51 percent owner and Prasla as 49
percent owner. The documents indicated Prasla was authorized to sign on the
corporation's business bank account, which was opened in 1997. Bank statements from
April, May, and June 2005 revealed that several checks, noted as "payroll checks," were
written to Prasla. The payroll checks issued to Prasla were all for the amount of $1308.33
and were issued bi-weekly. Prasla wrote at least one payroll check to himself. PNM
reported to the State of Texas that Prasla's wages from January 2004 to February 2005
were $78,000, with $13,500 in wages reported for the first two months of 2005. Prasla also
wrote payroll checks to other employees, and he wrote checks for alcohol, gasoline,
inventory, utilities, alarm services, and other miscellaneous items for PNM. Other payroll
checks were signed by Saukau K. Kadiwal. Kadiwal is believed to be Prasla's brother-in-law. Tullis also discovered checks made payable to Del Mar College and one check for
repairs on a vehicle driven by Prasla. A check in the amount of $38,000 was made out to
Prasla and signed by Pralsa. The check indicated it was for a loan refund. The records
also showed that Pralsa made a $5,000 cash withdrawal, but there was no indication as
to why the funds were withdrawn. 

 After reviewing the records, Tullis followed up with Momin. Tullis asked Momin to
fax documentation showing Prasla's authorization to work. Tullis never received the
requested documentation. On October, 3, 2005, Tullis observed Prasla unloading
supplies, including drinks, water, and food, from the back of his vehicle and carrying them
into the store. Tullis subsequently obtained confirmation from the United States
Department of Homeland Security that Prasla was not authorized to work in the United
States. 

 On October 5, 2005, while conducting surveillance of the premises, Tullis noticed
an outdoor advertising violation. He entered the establishment to issue a warning for the
violation. Inside the store, Tullis met J. Patel, a store employee. Patel stated to Tullis that
Prasla was the owner and manager of the store and that Prasla hired him. Patel did not
know and had not heard of Momin. Patel showed Tullis PNM's check book, which
contained blank checks pre-signed by Prasla. The register also showed payroll checks and
other checks signed by Prasla. Patel was called as a witness and testified that Prasla was
the "boss" and had hired him. However, Patel also claimed that Kadiwal was the manager,
signs his check, schedules his hours, and writes checks to the store's vendors. Patel
stated that Prasla does not go by the store everyday. 

 On October 5, Tullis also faxed PNM asking for Prasla to appear at the local TABC
office and provide documentation of his authorization to work in the United States. No
response was provided. A second written request was faxed on October 10, 2005, which
also obtained no response. 

 On October 12, 2005, Tullis issued a formal notice stating that a case was being
prepared against PNM for subterfuge and for failing to provide requested documents. (4) The
notice required PNM to meet with Tullis on October 18, 2005. Momin responded by asking
that the meeting be moved to Houston or to the first week in November. Because another
hearing involving PNM and concerning similar allegations was already scheduled for the
first week in November, Tullis decided to bring the matter to the SOAH. Again, Tullis never
received any documentation from PNM showing Prasla's immigration status. 

 TABC subsequently brought a disciplinary action against PNM, alleging that PNM
violated the Texas Alcoholic Beverage Code by allowing the use or display of its beverage
permit in the conduct of its business for the benefit of a person not authorized by law to
have an interest in the permit. See Tex. Alco. Bev. Code Ann. §§ 61.71(a)(15), (5) 109.53. (6)
 
 TABC brought a second administrative action against PNM alleging that PNM failed
to provide records, documents and information requested by TABC regarding the residency
status of Prasla. Tex. Alco. Bev. Code Ann. § 5.32 (Vernon 2007) (providing that TABC
may require the filing of reports or other data by persons engaged in the alcoholic
beverage business which TABC finds necessary to accomplish the purpose of the alcoholic
beverage code); see Tex. Alco. Bev. Code Ann. § 11.61(b)(2) (Vernon 2007) (providing
that TABC may cancel a permit if the permittee violated a provision of the alcoholic
beverage code); § 61.71(a)(1) (providing that TABC may cancel a retail dealer's on-or off-premise license if the licensee violated a provision of the alcoholic beverage code or a
TABC rule). 

 At the administrative law hearing, Tullis stated that in his opinion, the corporate
structure used by PNM is a subterfuge. Tullis specifically pointed to the original
supplemental application, which showed Prasla as an officer and to the later application
which showed Prasla only as a shareholder. Tullis stated that 51/49 percent ownership
splits are classic corporate models of subterfuge. Tullis testified that he believed PNM
knew the application would be denied if Prasla was listed as an officer; therefore, PNM
supplemented the application and listed Prasla only as a shareholder. Tullis stated that
TABC records show that Kadiwal and Prasla had previously been involved in submitting
a false application to TABC for a store in Kingsville, Texas. Criminal charges and an
indictment were filed against Kadiwal for making a false statement and for subterfuge. 
Tullis testified that he believes Kadiwal is part of the subterfuge scheme and that Kadiwal's
involvment with Prasla circumvents the code because Kadiwal is authorized to work in the
United States, while Prasla is not. Tullis explained that this allows PNM to argue that
Kadiwal runs and manages the store when, in fact, Prasla does. At the hearing, TABC
urged that the evidence demonstrated that Prasla's actual interest in PNM exceeded his
49 percent record ownership and that PNM's corporate structure was a subterfuge. Thus,
TABC alleged that PNM allowed the use of its license to benefit Prasla--a person not
authorized by law to have an interest in the license--in violation of section 61.71(a)(15). 
See id. § 61.71(a)(15). 

 PNM countered the subterfuge argument by presenting documentary evidence, as
well as Momin's testimony. Momin testified he lives in Houston and visits Star Trac #1,
which is located in Corpus Christi, once every six months. Momin stated that although he
lives in Houston, he controls PNM. Momin testified that at one point, Prasla had a work
visa and worked at Star Trac #1. Momin countered that although TABC alleged that Prasla
continued to overstep his lawful interest, after PNM received administrative notice, Prasla
quit working at the store. Momin maintained that he is, and always was, the sole officer
of PNM, and that Prasla is only a shareholder that looks after Star Trac #1. Momin
contended that Prasla was not involved in the day-to-day operation of the store, but
admitted that Prasla was paid $1,500 every fifteen days for his efforts related to the
management of Star Trac #1. Momin testified that he does not know who buys inventory
or makes deliveries to Star Trac #1. He also testified that Kadiwal, who is authorized to
work in the United States, is the manager of Star Trac #1, not Prasla.

 After the hearing(s), the administrative law judge (ALJ) issued findings of fact and
conclusions of law in cause numbers 458-06-206 and XXX-XX-XXXX. The ALJ found, inter
alia, that PNM's corporate structure is a subterfuge which allows Prasla, who never
established Texas residency, to have an interest in the permit, either as an officer of PNM
or as a manager of the licensed premises. See Tex. Alco. Bev. Code Ann. §§
61.71(a)(15), 109.53. The ALJ also found that PNM's business operations were carried
out by Prasla; that Prasla currently acts as a corporate officer because he signs corporate
checks, withdraws cash, withdraws his own shareholder draws from the corporate account;
that Prasla currently manages and controls the licensed premises, exercises control over
the employees, signs payroll checks, pays bills, and orders and delivers supplies and
inventory. The ALJ further found that Prasla is an employee of PNM, receives a salary,
performs certain duties for the business, that PNM benefits financially from the business,
and that PNM failed to provide the requested documents to TABC. 

 Based on the foregoing findings of fact, the ALJ entered the following contested
conclusions of law: (1) PNM allowed the use or display of its Wine and Beer Retailer's Off-Premise permit BQ-546829 in the conduct of a business for the benefit of a person not
authorized by law to have an interest in the permit in violation of sections 25.04(b),
61.71(a)(15) of the Texas Alcoholic Beverage Code, and (2) PNM failed to provide
requested documents in violation of section 5.32 of the Texas Alcoholic Beverage Code. 
See Tex. Alco. Bev. Code Ann. §§ 5.32, 25.04(b), 61.71(a)(15) (Vernon 2007).

 On June 5, 2006, TABC adopted the findings of fact and conclusions of law of the
administrative law judge and entered an order cancelling PNM's permit. See Tex. Alco.
Bev. Code Ann. § 25.04(b) (providing that the provisions of the code are applicable to the
cancellation of a wine and beer retailer's permit); Tex. Alco. Bev. Code Ann. § 26.03(b)
(Vernon 2007) (providing that the provisions of the code are applicable to the cancellation
of a wine and beer retailer's off-premise permit); see also 16 Tex. Admin. Code § 37.60(a)
( 2007) (providing that cancellation of the permit is the appropriate sanction for subterfuge). 
The order became final on June 26, 2006. On appeal, the district court concluded that the
TABC order was supported by substantial evidence and affirmed the cancellation of PNM's
permit. This appeal ensued. 

II. Standard of Review

 The substantial evidence rule governs our review of both the trial court's judgment
and the final order of the TABC. Tex. Alco. Bev. Code Ann. § 11.67(b) (Vernon 2007);
Four Stars Food Mart v. Tex. Alcoholic Beverage Comm'n, 923 S.W.2d 266, 269 (Tex.
App.-Fort Worth 1996, no writ). The test in applying this rule "is whether the evidence as
a whole is such that reasonable minds could have reached the same conclusion that the
agency must have reached in order to justify its action." Tex. Alcoholic Beverage Comm'n
v. Sierra, 784 S.W.2d 359, 360 (Tex. 1990). Whether substantial evidence supports an
administrative decision is a question of law. Tex. Dep't of Public Safety v. Alford, 209
S.W.3d 101, 103 (Tex. 2006). We focus our review on the reasonableness of the TABC
order, rather than its correctness. Morgan v. Tex. Alcoholic Beverage Comm'n, 519
S.W.2d 250, 254 (Tex. App.-Texarkana 1975, no writ). The TABC findings and
conclusions are presumed to be supported by substantial evidence and the burden is on
the complaining party to overcome this presumption. Four Stars Food Mart, 923 S.W.2d
at 269-70. Substantial evidence required to support the TABC's order is more than a mere
scintilla, but less than a preponderance of the evidence. Arreaga v. Bexar County Sheriff's
Dep't, 90 S.W.3d 899, 901 (Tex. App.-San Antonio 2002, no pet.). Accordingly, evidence
may actually preponderate against the decision of an agency and still amount to substantial
evidence. Garza v. Tex. Alcoholic Beverage Comm'n, 138 S.W.3d 609, 613 (Tex.
App.-Houston [14th Dist.] 2004, no pet.) (citing Lewis v. Metro. Sav. & Loan Ass'n, 550
S.W.2d 11, 13 (Tex. 1977)); Four Stars Food Mart, 923 S.W.2d at 269 (citing Haynes v.
City of Abilene, 659 S.W.2d 638, 640 (Tex. 1983)). In applying the substantial evidence
test, this Court is prohibited from substituting its judgment for that of the agency as to the
weight of the evidence on questions committed to agency discretion. Garza, 138 S.W.3d
at 613.

 Furthermore, regardless of the agency's stated reasons for its order, a reviewing
court may uphold the decision provided there is any valid basis for it in the record. Four
Stars Food Mart, 923 S.W.2d at 270. We may uphold the agency's decision if there is
substantial evidence to support one of the reasons given for its decision. Garza, 138
S.W.3d at 613 (citing Tex. State Bd. of Med. Exam'rs v. Scheffey, 949 S.W.2d 431, 436
(Tex. App.-Austin 1997, writ denied)).

III. Analysis

 In its first issue, PNM contends no substantial evidence supports the administrative
law judge's findings of fact and conclusions of law that PNM violated sections 25.04(b) and
61.71(a)(15) of the Texas Alcoholic Beverage Code. PNM claims that because they are
not supported by substantial evidence, these findings and conclusions are erroneous and
constitute an abuse of discretion. We disagree.

 After reviewing the record, we conclude substantial evidence supports the
administrative law judge's findings of fact and conclusions of law that PNM violated
sections 25.04(b) and 61.71(a)(15) of the Texas Alcoholic Beverage Code. See Tex. Alco.
Bev. Code Ann. § 11.67(b); Four Stars Food Mart, 923 S.W.2d at 269. The extensive
testimony of Tullis, as well as the numerous exhibits admitted during the hearing, support
the administrative law judge's findings of fact and conclusions of law. (7) Accordingly,
appellant's first issue is overruled.

 Given our disposition of appellant's first issue, we need not address PNM's
contentions in its second issue. See Garza, 138 S.W.3d at 613 (providing that this Court
may uphold the agency's decision if there is substantial evidence to support one of the
reasons given for the decision); Four Stars Food Mart, 923 S.W.2d at 270.

IV. Conclusion

 The judgment of the trial court is affirmed.

 

 

 __________________________ 

 DORI CONTRERAS GARZA,

 Justice


Memorandum Opinion delivered and 

filed this the 29th day of August, 2007.

1. TABC filed two administrative cases against PNM, specifically, docket numbers XXX-XX-XXXX and
XXX-XX-XXXX. The State Office of Administrative Hearings (SOAH) held a hearing on both cases on
November 2, 2005. PNM filed its petition for review of both cases with the district court. This appeal
encompasses both cases, filed under appellate cause number 13-06-00487-CV. 
2. We note that although the SOAH made a tape recording of the hearings, and although section
155.43(e) of the Texas Administrative Code provides that, upon written request by a party, a written transcript
of the tape recordings will be made, PNM did not avail itself of the option. Thus, we have not been provided
with a transcript of the proceedings before the SOAH. Further, PNM did not provide the tape recordings to
this Court. 


 As a result, on appeal, this Court was required to engage in the burdensome process of scouring
through a lengthy record to determine the underlying factual background and to determine what testimony and
evidence was actually before the SOAH. 
3. PNM was formed as a Texas corporation on December 23, 2002. 
4. Although not defined within the provisions of the Texas Alcoholic Beverage Code, "subterfuge" is
commonly recognized as "a clever plan or idea used to escape, avoid or conceal something <a subterfuge
to avoid liability under a statute>." Black's Law Dictionary 1162 (7th ed. 2000). 
5. Section 61.71(a)(15) provides that TABC may cancel a retail dealer's on- or off-premise license if
it is found, after notice and hearing, that the licensee permitted the use or display of his license in the conduct
of a business for the benefit of a person not authorized by law to have an interest in the license. Tex. Alco.
Bev. Code Ann. § 61.71(a)(15) (Vernon 2007). 
6. Pursuant to Texas Alcoholic Beverage Code section 109.53, the majority of a corporation's stock
must be owned by a resident citizen of Texas; however, no such residency requirement exists for minority
stockholders. See Tex. Alco. Bev. Code Ann. § 109.53 (Vernon 2007). Section 109.53 provides, in relevant
part, that:


No person who has not been a citizen of Texas for a period of one year immediately
preceding the filing of his application therefore shall be eligible to receive a permit under this
code. No permit . . . shall be issued to a corporation unless the same be incorporated under
the laws of the state and unless at least 51 percent of the stock of the corporation is owned
at all times by citizens who have resided within the state for a period of one year and who
possess the qualifications required of other applicants for permits . . . .


 . . . .


It is the intent of the legislature to prevent subterfuge ownership of or unlawful use of a permit
or the premises covered by such permit; and all provisions of this code shall be liberally
construed to carry out this intent, and it shall be the duty of the commission or the
administrator to provide strict adherence to the general policy of preventing subterfuge
ownership and related practices hereinafter declared to constitute unlawful trade practices.


See id.

7. We note that in its first issue, PNM specifically claims that its activities were legitimate under the
Texas Business Corporation Act and/or the Texas Business Organization Code. Although it is possible that
PNM is correct, our review concerns whether PNM's business operations were legitimate under the Texas
Alcoholic Beverage Code. Because we conclude that there was substantial evidence to support the findings
and conclusions that PNM's actions were in violation of the alcoholic beverage code, we need not address
this contention. See Tex. R. App. P. 47.1.